# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VYNAMIC, LLC,                          :
      Plaintiff,                  :          CIVIL ACTION
                      :
    v.                                 :
                      :
DIEBOLD NIXDORF, INC.,                 :          No. 18-577
      Defendant.                  :

## MEMORANDUM

**Schiller, J.**                                                                      **January 15, 2019**

Just how similar is "VYNAMIC" to "VYNAMIC"? That is the question posed in this trademark infringement case. Vynamic offers digital engagement services that help clients improve their marketing and customer services capabilities. Its focus is in the healthcare realm. Diebold Nixdorf ("Diebold") makes, sells, and services items such as automatic teller machines and point of sale systems. It targets the financial services and retail industries with its hardware and software. Vynamic claims that its mark is strong and there is significant overlap in the parties' target markets such that there is a likelihood of confusion regarding the origin of Vynamic's products. Diebold counters with several arguments. First, Vynamic's mark may be strong in the healthcare industry, the companies focus on different customers and do not compete. Moreover, Diebold contends, the products involved here are expensive and are sold to savvy, sophisticated customers who will not be easily fooled. Additionally, the marks have peacefully coexisted for over a year without any confusion.

The parties have filed cross-motions for summary judgment. The lawyers have done an admirable job, both effectively advocating on behalf of their clients. Both sides have taken reasonable positions in most instances. The law of trademark infringement, however, demands a fact-intensive inquiry. And the records, briefs, and arguments have convinced this Court that there

are genuine issues of material fact that preclude granting summary judgment for either side. The Court therefore denies both motions for summary judgment.

## I.   BACKGROUND

Vynamic's Amended Complaint includes four claims: (1) Lanham Act trademark infringement; (2) Lanham Act Unfair Competition; (3) dilution under Pennsylvania law; and (4) unfair competition under Pennsylvania. Vynamic accuses Diebold of using trademarks that are confusingly similar to its registered trademarks, "VYNAMIC®," "VYNAMIC & Design®," and "I AM VYNAMIC®."

### A.   The Companies

Vynamic is a Connecticut LLC formed on January 1, 2004 by Daniel Calista. (Pl.'s Statement of Undisputed Facts in Supp. of Its Mot. for Summ. J. [Pl.'s SOF] ¶ 2.) The entity was originally named Vynamic Solutions, LLC, prior to changing its name on February 20, 2008. (*Id.*) Vynamic was acquired by UDG Healthcare, a global healthcare company, in 2017. (Def.'s Resp. to Pl.'s Statement of Undisputed Facts [Def.'s SOF Resp.] ¶ 2.) Plaintiff is currently part of UDG Healthcare's Ashfield Healthcare Division. (Def.'s Statement of Undisputed Facts in Supp. of Its Mot. for Summ. J. [Def.'s SOF] ¶ 30.) Vynamic has approximately 110 employees and total sales of $35.4 million for fiscal year 2017. (Pl.'s SOF ¶¶ 3-4.)

Diebold is an Ohio corporation with 23,000 employees worldwide and total sales of over $4.6 billion for fiscal year 2017. (*Id.* ¶¶ 17-18, 20.)

Vynamic's primary focus is on clients in the healthcare industry. (*Id.* ¶ 9.) Indeed, it sometimes uses the slogan "All Healthcare All The Time." (Def.'s SOF ¶ 16.) Its website also includes a healthcare industry tab that states, "We focus exclusively on the healthcare industry." (*Id.* ¶ 17.) Its clients include GlaxoSmithKline, GMAC, Walmart, Five Below, AstraZeneca, and

Independence Blue Cross. (Pl.'s SOF ¶ 10.) However, Plaintiff does not have an active contract with Five Below or Walmart. (Pl.'s Resp. to Def.'s Statements of Undisputed Facts [Pl.'s SOF Resp.] ¶¶ 22-23.)

According to Vynamic, it "offers services related to digital engagement, including digital messaging and content delivery, and digital engagement across multiple channels." (Pl.'s SOF ¶ 11.) It "helps its clients improve their marketing and customer service capabilities using data-driven digital innovation strategies." (*Id.* ¶ 12.) It does this through strategic planning, vendor selection and management, process design, systems implementation, and organizational change. (Pl.'s SOF Resp. ¶ 19.) Vynamic also "provides management and implementation services related to mobile applications offered by its clients." (Pl.'s SOF ¶ 13.) Finally, the company "provides project management services for clients looking to expand and improve their digital marketing and consumer engagement strategies across channels such as social media, websites, mobile applications, and text messaging." (*Id.* ¶ 14.)

Diebold's target audience is "generally substantial operations with dozens or hundreds of locations." (*Id.* ¶ 45.) It targets financial institutions and retailers. (Def.'s SOF ¶ 52; Def.'s SOF Resp. ¶ 45.) Included in this group is "drug stores, grocery stores, and other sub-segments that use point-of-sale systems." (Def.'s SOF Resp. ¶ 52.) Its market is broad-based and not aimed at specific companies. (*Id.*) Its customers include Bank of America, J.P. Morgan Chase, Citi Group, HSBC, and PNC. (Def.'s SOF ¶ 60.) Diebold derives no revenue from healthcare companies, does not have employees in the healthcare field, and has not attempted to market its Vynamic software portfolio to the healthcare industry. (Def.'s SOF Resp. ¶ 9.)

Diebold has three lines of business: (1) services, which refers to break and fix services; (2) systems, which refers to hardware such as ATM and point-of-sale machines; and (3) software,

which encompasses software portfolios. (Def.'s SOF ¶ 51.)[1] Its products and service offerings are expensive. (*Id.* ¶ 58.)

Defendant markets its Vynamic software and related services at trade shows, including the National Retail Federation Big Show. (Pl.'s SOF ¶ 50.) According to Plaintiff, some of Vynamic's clients attend this trade show. (*Id.* ¶ 51.)

## B. The Marks

### 1. Vynamic

Vynamic has used its mark continuously from at least January 2004. (*Id.* ¶ 7.) Vynamic registered the "VYNAMIC" mark on February 21, 2006, for:

> Management services, consulting, planning, project management, and information related thereto; business marketing advice; commercial and business consulting and information thereto; business consulting regarding new ventures and mergers and acquisitions; business analysis; market analysis; business evaluations; economic research and analysis; drafting business expert reports; administrative management of projects in the field of developing, specifying, installing and implementing business solutions; business consulting in the area of trade in technological products; providing information related to consulting in the area of enterprise organization; business consultation and private consultation in the field of executive coaching; the aforementioned services rendered through a nationwide network of resources[.]

(*Id.* ¶ 5.) Vynamic registered the "VYNAMIC & Design" and "I AM VYNAMIC" marks on February 26, 2013 for: "Business management consulting; Providing information in the fields of business management, business marketing, and business mergers and acquisitions consulting, the foregoing information pertaining to the healthcare industry." (*Id.*)

---

[1] If the Court may be so bold as to offer a suggestion, the parties must clearly and succinctly explain what its products do. And preferably without technical jargon. It will be difficult for a factfinder to decide how much—if any—overlap between goods and services exists if it is unclear about the products and services these companies offer. Stated differently, if faced with an intelligent group of adults unfamiliar with your products, what is your elevator pitch that encapsulates your work so that they may understand?

### 2. Diebold

In April of 2017, Diebold hired Brand Acumen Solutions to come up with a new name for its existing suite of banking software. (Pl.'s SOF ¶ 24; Def.'s SOF ¶ 38.) During this rebranding, Diebold elected to include the company's existing retail software suite in the rebranding. (Pl.'s SOF ¶ 26.) Based on Brand Acumen's market research, a list of four possible names, including VYNAMIC, was prepared on June 29, 2017. (Def.'s SOF Resp. ¶ 27; Def.'s SOF ¶ 40.) Alan Kerr, Diebold's Senior Vice President, Software, and Chief Revenue Officer, narrowed the list to two names. (Pl.'s SOF ¶ 28.) The two finalists, one of which was VYNAMIC, were presented to Andreas Mattes, Diebold's CEO, on August 22, 2017, during which time he performed a Google search on the two finalists, only to learn that both names were already being used. (*Id*. ¶ 31.) This date is the first time Diebold learned of Vynamic. (*Id*. ¶ 32.) Diebold launched use of DN VYNAMIC and VYNAMIC at a conference on October 23, 2017. (*Id*. ¶ 47.)

The parties hotly dispute the import of Diebold's internal discussions and decision-making process regarding the selection of the VYNAMIC mark. Because the Court considers Defendant's intent on this subject to be vital to the infringement analysis and because each side will be entitled to present its version to the factfinder, the Court will not spend a great deal of ink on each side's version of the events. Rather, to make two long stories short, there was some concern internally at Diebold about using the VYNAMIC mark and some form of legal counsel was sought after Diebold learned of Vynamic's existence to seek clearance to use the selected mark. (Def.'s SOF Resp. ¶¶ 33-35; Pl.'s SOF Resp. ¶ 43.) However, a trademark search performed by Diebold's inhouse counsel failed to return Vynamic's existing trademark registrations. (Pl.'s SOF ¶ 39.)

Plaintiff sent Defendant a cease and desist letter on October 27, 2017, to which Defendant responded on November 10, 2017. (Def.'s SOF ¶ 48.)

### 3. The look of the marks

For the viewing pleasure of the reader, here are some examples of the marks. The first example is Defendant's mark, the second example is Plaintiff's mark, and the third example features Plaintiff's on the left and Defendant's on the right.



 

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to decide in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002). A court must apply the same standards to cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987); *see also St. Paul Fire & Marine Ins. Co. v. Primavera Software, Inc.*, Civ. A. No. 09-3908, 2011 WL 3438077, at *3 (E.D. Pa. Aug. 5, 2011).

Summary judgment in trademark cases is disfavored due to the factual nature of the applicable legal framework, specifically, the likelihood of confusion analysis. *See Steak Umm Co. v. Steak 'Em Up, Inc.*, Civ. A. No. 09-2857, 2011 WL 3679155, at *3 (E.D. Pa. Aug. 23, 2011); *see also Country Floors, Inc. v. P'ship of Gepner & Ford*, 930 F.2d 1056, 1062-63 (3d Cir. 1991) (noting that summary judgment is the "exception" in trademark cases); *Entrepreneur Media, Inc.*

*v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002) ("Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena.").

## III.    DISCUSSION

To establish a trademark infringement claim, a plaintiff must demonstrate: (1) a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994). Plaintiff's claims for federal trademark infringement and federal unfair competition will be evaluated using the same standard. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Additionally, Plaintiff's claim for unfair competition under Pennsylvania law is "essentially the same as the test for unfair competition under the Lanham Act."[2] *Bath Auth., LLC v. Anzzi LLC*, Civ. A. No. 18-834, 2018 WL 5112889, at *4 (E.D. Pa. Oct. 19, 2018).

For purposes of these cross-motions, Diebold does not contest that the first two elements of Vynamic's trademark claim are established, and therefore the Court will treat the ownership and valid mark prongs as met. Thus, the battle here is over likelihood of confusion.

### A.    The *Lapp* Factors

It will come as no surprise to any IP lawyer that Vynamic's claims will be evaluated using the *Lapp* factors. *See Interspace Corp. v. Lapp Inc.*, 721 F.2d 460 (3d Cir. 1983). This is a case of reverse confusion, in which the junior user of the mark, here, Diebold, is the larger and more powerful company relative to Vynamic, the smaller and senior user of the mark. In a case of reverse confusion, the *Lapp* factors are: (1) the degree of similarity between the owner's mark and the

---

[2] The Court will also deny Diebold's motion for summary judgment on Vynamic's Pennsylvania state dilution claim because the issue of likelihood of confusion is disputed.

alleged infringing mark; (2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertising through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; (10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market. *A & H Sportswear*, 237 F.3d at 234. No single factor is dispositive, and in some cases, some factors may not be relevant to the likelihood of confusion analysis. *Id*.

### 1. Degree of Similarity

The degree of similarity between two marks is often the single most important factor in determining whether a likelihood of confusion exists. *See, e.g.*, *Fisons Horticulture*, 30 F.3d at 476; *Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 462 (E.D. Pa. 2012). The marks do not have to be identical, merely confusingly similar. *See Fisons Horticulture*, 30 F.3d at 477.

Courts should compare the appearance, sound, and meaning of the marks to determine similarity. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 281 (3d Cir. 2001). However, "[s]ide-by-side comparison of the two marks is not the proper method for analysis when the products are not usually sold in such a fashion. Instead, an effort must be made to move

into the mind of the roving consumer." *A & H Sportswear*, 237 F.3d at 216. It is the "more forceful and distinctive aspects of a mark" that should be the Court's focus. *Id*.

Vynamic argues that the marks here "are spelled the same. They look the same. They are pronounced the same. Indeed, the marks as used in commerce are virtually identical in all respects except color scheme." (Pl.'s Mem. of Law in Supp. of Its Mot. for Summ. J. On Its First, Second, & Fourth Claims For Relief [Pl.'s Mem.] at 8.) Defendant counters that it uses various versions of "VYNAMIC" under the "DN VYNAMIC" mark in addition to other words and that although "there is overlap of the word 'VYNAMIC,' the similarities end there." (Def.'s Mem. of Law in Supp. of Its Mot. for Summ. J. [Def.'s Mem.] at 6.) Diebold also notes that the marks employ different designs, fonts, and colors. (*Id*. at 7.)

Diebold has understated the overlap between the two marks. Mindful that a side-by-side comparison might not be warranted here, the Court nevertheless requests that counsel for Diebold sit down with their client and look at these two marks. Ask people on the street, inquire of spouses and children. Visualize Vynamic's counsel's opening statement during which he or she shows these two marks to the factfinder, pronounces the word "Vynamic," a made-up word likely, and repeatedly points out that the marks are pronounced and spelled identically. What impression would that make?

Diebold tries to minimize the obvious similarity here. For example, Diebold notes that it regularly uses the "VYNAMIC" mark with other words, including its housemark.[3] The fact that Diebold sometimes uses its housemark along with the mark at issue here does not necessarily reduce the likelihood of confusion. In a reverse confusion case, the use of a well-known housemark may exacerbate confusion by reinforcing a link between the mark and the junior user. *A & H*

---

[3] A housemark is a company's corporate name. *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 475 n.19 (3d Cir. 2005).

*Sportswear*, 237 F.3d at 230. However, some courts continue to adhere to the belief that the use of a housemark diminishes the likelihood of confusion, even in reverse confusion cases. *See Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, Civ. A. No. 11-3684, 2017 WL 3719468, at *22 (D.N.J. Aug. 29, 2017) (citing cases).

The similarity prong tilts towards Plaintiff for several reasons. First, the Court is not persuaded that the use of other words or a housemark minimizes the similarity here. Defendant cannot escape the similarity of the two marks by arguing that sometimes its mark includes a qualifier or housemark that alters the mark and diminishes the likelihood of confusion. *See A & H Sportswear*, 237 F.3d at 230 ("As to the presence of the housemark on the Victoria's Secret product, not only is there the possibility that consumers will fail to remember the mark when encountering A & H's swimwear, but there is also the possibility that the mark will *aggravate*, rather than mitigate, reverse confusion, by reinforcing the association of the word 'miracle' exclusively with Victoria's Secret."). Second, Diebold ignores those instances in the record when the mark does appear alone. Third, whether the different fonts, color schemes, and designs renders confusion less likely is a matter of fact for a factfinder to decide. The marks need not be identical, only confusingly similar. A factfinder will have to judge whether Diebold has done enough to its mark to escape the similarity evident from the name. Finally, even when a housemark or other term is employed, the common denominator remains the mark, "VYNAMIC," which remains the focal point aimed at providing the customer with a lasting impression. This Court must focus on the distinctive part of the mark, which is clearly "VYNAMIC," a made-up word used in both marks. A party cannot avoid trademark infringement by appropriating the key features of a mark but adding some additional terms. *See Cont'l Connector Corp. v. Cont'l Specialties Corp.*, 492 F. Supp. 1088, 1095 (D. Conn. 1979) ("Courts have repeatedly held that the confusion created by use

of the same word as a primary element in a trademark is not counteracted by the addition of another term.") A company cannot affix a word or two to the golden arches and not expect to draw the ire of McDonald's.

This factor favors Vynamic.

### 2. Strength of the Mark

The strength of a mark is determined by its (1) conceptual strength and (2) commercial strength. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 184-85 (3d Cir. 2010). Courts use four categories to classify the distinctive strength of a mark, from strongest to weakest: "(1) arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods; (2) suggestive terms, which suggest rather than describe the characteristics of the goods; (3) descriptive terms, which describe a characteristic or ingredient of the article to which it refers; and (4) generic terms, which function as the common descriptive name of a product class." *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008). Within the first category, fanciful terms are "'coined' words that have been invented or selected for the sole purpose of functioning as a trademark" or service mark. 2 MCCARTHY ON TRADEMARKS § 11:5. They contain "words that are either totally unknown in the language or are completely out of common usage at the time, as with obsolete or scientific terms." *Rann Pharmacy, Inc. v. Shree Navdurga LLC*, Civ. A. No. 16-4908, 2016 WL 6876350, at *4 (E.D. Pa. Nov. 22, 2016). Arbitrary or fanciful marks receive the strongest protection. *UHS of Del., Inc. v. United Health Servs., Inc.*, 227 F. Supp. 3d 381, 393 (M.D. Pa. Dec. 29, 2016) ("The strongest marks—designated arbitrary or fanciful—generally do not describe or imply anything about their associated product.").

Vynamic argues that its mark is arbitrary or fanciful because Vynamic's founder created the term, which has no meaning in English. (Pl.'s Mem. at 9-10.) Diebold concedes for purposes of its summary judgment motion that Plaintiff's mark is strong in the healthcare industry. (Def.'s Mem. at 7 n.2.) However, Diebold suggests that the strength of Vynamic's mark may be less than it appears at first glance. Plaintiff was not the first company to use the name "VYNAMIC," a fact that demonstrates that the name can be used in different industries. (Def.'s Mem. at 8.)

Defendant's argument is reasonable. Indeed, it strikes this Court as an ideal argument to put before a factfinder. A mark's strength may not extend beyond a single field or industry. *Horn's, Inc. v. Sanofi Beaute, Inc.*, 963 F. Supp. 318, 322 (S.D.N.Y. 1997) (noting that strong marks in the fashion industry may have little or no strength in the perfume industry). But Vynamic also raises an important question that a factfinder might want to know the answer to: if the mark is not really that conceptually strong, why would Diebold select it for its software? (*See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Pl.'s Opp'n] at 8.)

Diebold focuses its argument regarding this *Lapp* factor on the commercial strength of the mark. The commercial strength of Plaintiff's mark is also a factfinder question. Diebold relies on evidence that Vynamic touts itself as a healthcare industry management consulting firm that exists almost singularly in one industry. (Def.'s Mem. at 9-10.) From Diebold's perspective, Vynamic is focused solely on the healthcare industry, which is the industry in which all its customers operate. (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Partial Summ. J. [Def.'s Opp'n] at 7.) Diebold also contends that it's not in the healthcare consulting business, has no healthcare clients, and is not looking for such clients. (*Id*. at 8.) Accordingly, outside of this one industry, Plaintiff's mark is weak. (Def.'s Mem. at 9-10.)

This dispute is genuine and involves material facts. The record reveals that Vynamic has made its mark in the healthcare industry. However, Vynamic has submitted evidence that suggests its reach extends beyond a single industry and that the healthcare industry is currently marked by players who may overlap with those in Diebold's target markets. Therefore, the ultimate strength of the mark—particularly its commercial strength—must be decided by a factfinder. *See Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 663 (4th Cir. 2018) (noting that an inherently strong mark may "never realize[] its potential for fame and recognition in the marketplace and will not be deemed strong overall;" conversely a mark with sufficient commercial strength may be deemed strong overall despite its conceptual weakness). Conceptually, Plaintiff's mark is strong, though the creation of the word might be an avenue Diebold will further pursue at trial. Commercially, the parties' arguments highlight why this case is not appropriate for summary judgment. There is a strong disagreement as to the industry overlap here. While Diebold might be overstating the extent that Vynamic participates in one industry to the exclusion of all other industries, it has certainly put forward evidence from which a factfinder could conclude that the overlap between the parties in terms of customers and sales is minimal, which very well may decrease the likelihood of confusion.

Ultimately, the fanciful nature of the mark tilts this factor ever so slightly towards Vynamic. However, that tilting is closer to the realm of neutrality, as Diebold suggests, and not heavily in its favor, as Vynamic contends.

### 3. Customer Sophistication

More sophisticated consumers are more likely to take great care when buying a product, rendering confusion less likely. *Steak Umm Co.*, 2011 WL 3679155, at *5; *Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc.*, 511 F. Supp. 2d 482, 493 (E.D. Pa. 2007) ("[C]onsumers are going

to be much less likely to be confused by the similarity in two marks when choosing between cars than when buying an air freshener to hang from the rearview mirror of a car.").

Vynamic argues that its mark is seen by a wide array of purchasers, some of whom are not sophisticated, and that "the court should look to the lowest level of purchasers to determine how discriminating the relevant purchasing class is." (Pl.'s Mem. at 11.) To bolster its argument on this *Lapp* factor, Vynamic cites to the phenomenon of initial interest confusion, which Vynamic posits is not impossible. (Pl.'s Opp'n at 12.) Initial interest confusion occurs when a customer is drawn to a product by its similarity to a known mark, but the customer learns of the true identity and origin of the product before a sale occurs. *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 290 (D.N.J. 2006). It is actionable under the Lanham Act. *See Checkpoint Sys.*, 269 F.3d at 292. Diebold counters that "undisputed facts demonstrate the high price and careful attention given to the purchases of both Plaintiff's and Defendant's products." (Def.'s Mem. at 11.)

Diebold has the better of the argument on this *Lapp* factor. First, the goods and services in this case are not purchased on a whim, nor are they inexpensive. Customers do not simply encounter these items at their local grocery store or big-box chain. Business consumers expend considerable resources into these purchases. Second, Vynamic's initial interest confusion theory is not well developed. At this point, the initial interest confusion argument is also speculative because the record contains no evidence of any initial interest confusion. Vynamic has merely noted that its customers and target customers attend trade shows where those companies might encounter Diebold's Vynamic products. This is hypothetical. If Vynamic could produce affidavits or other evidence of initial interest confusion, so be it. The mere possibility of an already somewhat attenuated concept of confusion (in which a sophisticated customer is at first confused about the source of goods before it realizes that if it is going to spend significant sums on an important

product, it should learn with whom it is dealing) is not enough to tip this *Lapp* factor in Plaintiff's favor. Currently, there is no suggestion that customers are at first diverted to Diebold only to later discover the true origin of the product.

This factor favors Diebold. Neither of these products qualify as impulse purchases. No customer is going to spend the considerable costs for the products here without careful consideration of the pros and cons of the purchase.

### 4. Length of Time Mark Has Been Used/Lack of Confusion

If the parties concurrently use similar marks for a sufficient period without actual confusion, it may be inferred that future consumers will also not be confused. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 717 (3d Cir. 2004). This factor is weighed alongside evidence of actual confusion. *Steak Umm*, 2011 WL 3679155, at *5. "Evidence of actual confusion is not required to prove likelihood of conclusion." *Checkpoint Sys.*, 269 F.3d at 291. However, the longer a product has been sold without actual confusion, the stronger the inference that confusion will not occur in the future. *See Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 205 (3d Cir. 1995).

Vynamic contends that although there have not been any reports of actual confusion, "Diebold has only used the VYNAMIC marks for slightly more than one year." (Pl.'s Mem. at 12.) Diebold counters that these marks have coexisted without any evidence of actual confusion for over thirteen months. (Def.'s SOF ¶ 79.) It argues that this is a sufficient amount of time from which the Court can conclude that this factor favors Diebold.

The Court agrees with Diebold on this point. Diebold has used the VYNAMIC mark for approximately one year without any reports of actual confusion. As Diebold points out, courts have concluded that a similar timeframe to that here is long enough to uncover evidence of actual confusion. *See Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 768 (8th Cir.

2010) ("The district court held Sensient failed to produce any evidence of actual confusion, which it noted was telling since the SensoryEffects name has been in use at the time for approximately one year."); *Giorgio Beverly Hills, Inc. v. Revlon Consumer Prods. Corp.*, 869 F. Supp. 176, 185-86 (S.D.N.Y. 1994) ("Revlon has promoted and sold Charlie RED for over one year, though. As with the domestic market, Giorgio has failed to present any evidence of actual confusion in the European markets."). *But see Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 121 (1st Cir. 2006) ("Historically, we have attached substantial weight to a trademark holder's failure to prove actual confusion only in instances in which the relevant products have coexisted on the market for a long period of time. This is not such a case: M.V.'s product was introduced to the Puerto Rican market in April of 2003, and M.V.'s own evidence suggests that sales did not proliferate until the summer of 2004. This corresponds to the time frame in which Borinquen discovered the presence of Nestlé Ricas and took action to protect its mark. Since the preliminary injunction issued just over a year later, there was no protracted period of product coexistence.")

One year is not an exorbitant amount of time but it is long enough that one would expect some evidence of actual confusion. Accordingly, this factor weighs in favor of Diebold.

### 5. Intent of Defendant in Adopting the Mark

This factor requires courts to consider whether the defendant selected the mark to intentionally confuse consumers and whether the defendant used adequate care in investigating its mark prior to adoption. *Sabinsa Corp.*, 609 F.3d at 187. An intent to confuse is not required to make out a Lanham Act violation, but willful adoption of a similar mark weighs strongly in favor of finding a likelihood of confusion. *Checkpoint Sys.*, 269 F.3d at 286.

The evidence presents a clear issue of material fact as to whether this factor favors Plaintiff or Defendant. Moreover, the Court considers this a vitally important factor in this case. Diebold

hired a branding agency to select a new name for its software. (Pl.'s SOF ¶ 24.) Through this process, Diebold became aware of Vynamic. Diebold performed a search for the VYNAMIC mark, but the nature and breadth of that mark is disputed. The parties paint widely divergent pictures: Plaintiff suggests that Defendant threw caution to the wind and knowingly infringed on its trademark rights, hoping to dominate the "VYNAMIC" name. Defendant counters that it performed a trademark search, and though it was aware of Vynamic, reasonably believed that there was no legal issue because the two companies do not compete or overlap in industries or customers.

These positions are impossible to reconcile. They also make it impossible for the Court to weigh this factor in favor of either of party.

### 6. Marketing/Advertising Channels and Customer Targets

"Courts have recognized that the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 288-89. This is a fact-intensive inquiry that examines the trade exhibitions, publications, and other media the parties use in marketing and selling their products to customers. *Id*. at 289. The targeting of customers *Lapp* factor recognizes that if companies focus their sales efforts on the same customers, the likelihood of confusion increases. *Id*.

Vynamic points out that some of its customers attend trade shows where Diebold maintains a presence. (Pl.'s Mem. at 17.) According to Vynamic, "confusion is likely to occur *because of* Diebold's presence at those trade shows, at which Vynamic's clients also are present. Many of Vynamic's current and target clients attend the same trade shows where Diebold heavily markets its VYNAMIC products and services." (Pl.'s Opp'n at 16.) Plaintiff also notes that Defendant has done business with at least two of its customers and that Diebold is pushing into markets that may be in the healthcare industry. (Pl.'s Mem. at 16-17; Pl.'s Opp'n at 17-18.) Diebold counters that

Vynamic has misstated the parties' business relationships and that "[c]onsumer overlap is . . . very unlikely." (Def.'s Opp'n at 16-17.)

The Court concludes that based on the record presented, these *Lapp* factors favor Diebold. Vynamic has presented evidence that Diebold attended at least one trade show in which Vynamic's customers may have also appeared. And both companies utilize social media to reach potential customers. But this is far too thin a reed upon which to find in favor of Vynamic on this factor. Most, if not all companies, maintain some sort of social media presence. And the fact that Diebold employees were physically located at a trade show where it was possible that a Vynamic customer might also be physically present fails to make Vynamic's case that these companies use the same advertising and marketing channels. Right now, the question of how these products and services are sold does not appear similar and thus this factor favors Diebold.

However, the question of to whom these products are sold is close enough that each side is entitled to present its case to a factfinder. Without question, Plaintiff focuses on the healthcare industry while Defendant targets financial institutions and large retailers. However, the Court concludes that Diebold has too narrowly couched the universe of Vynamic's target customers as well as failed to recognize that Diebold's customers may participate in the healthcare industry such that Diebold might offer products and solutions that compete with Vynamic. Indeed, it is not difficult to imagine that both parties' products could wind up in the same locations.

### 7. The Relationship of the Goods in the Minds of Consumers

This factor assesses whether buyers and users of each parties' goods are likely to encounter the goods of the other, permitting an assumption that the products derive from the same source. *Checkpoint Sys.*, 269 F.3d at 286. This analysis is "intensely factual," but "[w]hen two products

are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark." *Id*. at 288.

Vynamic states that both parties target the customers looking to "[e]ngage better with their own customers and analyze customer data, [i]dentify and implement digital and software tools to perform certain functions, and [i]ntegrate new technologies into their businesses." (Pl.'s Mem. at 18.) Essentially, Vynamic argues that both companies offer similar products and services.

Diebold argues that no reasonable customer would be confused here because Vynamic focuses exclusively on the healthcare industry. Because the parties operate in different markets, "no reasonable consumer could think a company manufacturing and selling financial and point-of-sale hardware and software to banks and retailers would offer business management consulting to healthcare companies." (Def.'s Mem. at 17.)

This factor is too wrapped up in the question of market overlap for the Court to address it as a matter of law. Plaintiff's view of its target customers for the parties is rather broad. What company does not look to better engage with customers and integrate new technology into its business? Companies that fail at these aims do not have long lives as companies. But Diebold may have trimmed Vynamic's market reach too much. The exact goods and services provided, and the markets these parties reach, is subject to dispute. Thus, this matter must be decided by a factfinder.

> **8. Other Facts Suggesting That the Consuming Public Might Expect the Larger, More Powerful Company to Manufacture Both Products, or Expect the Larger Company to Manufacture a Product in the Plaintiff's Market, or Expect that the Larger Company is Likely to Expand Into the Plaintiff's Market**

In the reverse confusion context, this factor asks whether "the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger

company to manufacture a product in the plaintiff's market, or expect the larger company is likely to expand into the plaintiff's market." *A & H Sportwear*, 237 F.3d at 234.

This factor appears neutral or slightly tilted toward Diebold. There is no evidence that Diebold intends to directly compete with Vynamic in the healthcare industry. Again, however, the core services provided by these companies—and to what industries those core services are provided—is disputed. So, while it may be a stretch for Vynamic to contend that "it is thus highly likely that a consumer would expect that the source of the parties' goods and services is singular," until a factfinder decides some of the issues regarding market overlap, summary judgment is inappropriate.

### B.    Damages

Diebold claims that Vynamic cannot recover monetary damages in this case and that disgorgement of Diebold's profits is not available. (Def.'s Mem. at 22-24.) Vynamic concedes that it is "seeking damages in the form of Diebold's profits, not the damages sustained by Vynamic." (Pl.'s Opp'n at 22.)

The law provides that a Plaintiff who has made out a Lanham Act claim may recover: (1) defendant's profits; (2) any damages sustained by the plaintiff; and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its discretion. 15 U.S.C. § 1117(a).

"[A]n accounting of the infringer's profits is available if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement. These rationales are stated disjunctively; any one will do." *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 178 (3d Cir. 2005). When deciding whether equity favors disgorgement, courts should examine: (1) whether the defendant had the intent to confuse or deceive; (2) whether sales have been

diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting his rights; (5) the public interest in making the misconduct unprofitable; and (6) whether it is a case of palming off. *Id*. at 175 (citing *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002).

At this point in time, the Court cannot adequately address the *Banjo Buddies* factors. For one, Defendant's intent is disputed. The Court cannot conclude at this stage of the proceedings that Vynamic is not, as a matter of law, entitled to Diebold's profits. If necessary, the Court will rule on the issue of damages later.

## IV.    CONCLUSION

From the Court's vantage point, these marks are similar, both employing a created name that has no meaning in English. The strength of Plaintiff's mark, however, may be diminished because Vynamic aims its products at the healthcare industry, which is not the focus of Diebold's sales and marketing efforts. Diebold has introduced evidence that the nature of the goods and services coupled with the sophistication of the consumers makes confusion unlikely. Diebold also points out that to date there has been no evidence of any actual confusion. But the record includes evidence from which a factfinder may conclude that there is overlap in customers between the parties, which would greatly increase the likelihood of confusion. Moreover, a factfinder could conclude that Diebold operated with a malicious intent, or at least determined that Plaintiff's mark could be ignored. Ultimately, a factfinder must resolve these factual disputes and decide the question of infringement. Therefore, the motions for summary judgment are denied. An Order consistent with this Memorandum will be docketed separately.