**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VYNAMIC, LLC,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **DIEBOLD NIXDORF, INC.,** | : | **No. 18-577** |
| **Defendant.** | : | |

<u>**FINDINGS OF FACTS AND CONCLUSIONS OF LAW**</u>

**Schiller, J.**                                                                                      **June 17, 2019**

Vynamic, LLC offers management consultant services, largely to companies in the healthcare industry. It is the owner of the "VYNAMIC" mark. In 2017, Diebold Nixdorf, which makes ATMs and point-of-sale machines, chose the name "VYNAMIC" for a new software suite that it was launching. Diebold's use of the name Vynamic spurred this trademark infringement litigation. In this Court's Memorandum denying the parties' summary judgment motions, this Court wrote that this trademark infringement lawsuit asks the question, just how similar is VYNAMIC to VYNAMIC? On February 4 and 5, 2019, this Court held a bench trial to answer that question.

## I.   FINDINGS OF FACT

### a.  Vynamic

Vynamic was founded in 2002 by Daniel Calista. (Feb. 4, 2019 Trial Tr. at 25, 77-78.) Calista was the CEO and sole owner of Vynamic until 2017. (*Id*. at 77.) The company is headquartered in Philadelphia and maintains offices in Boston and London. (*Id*.) The company has 130 employees. (*Id*.) Vynamic's parent company, as of July 1, 2017, is UDG Healthcare, PLC. (*Id*. at 48.) Vynamic is "in the management consulting business which includes technology consulting." (*Id*. at 27-28.) "Vynamic helps companies to change and to improve their business.

Oftentimes, that encompasses helping businesses engage with their customers in a unique and difficult way, often through digital means." (*Id*. at 26.) As explained by Vynamic's current CEO Jeff Dill, Vynamic analyzes data to assess challenges and problems that its clients face, providing them with recommendations for moving forward. (*Id*.) Dill provided examples of problems that clients might bring to Vynamic for solutions: a client may wish to implement a new financial system or seek ways to better engage with customers. (*Id*. at 27.) Vynamic might help clients select vendors that would implement a financial system. (*Id*.) Vynamic also builds software. (*Id*. at 28.) As part of its business model, Vynamic trains individuals who will use the new systems. (*Id*. at 29.)

Vynamic works with a broad set of clients but it "clearly ha[s] a focus within healthcare. Healthcare is a significant focus of [its] client base." (*Id*. at 30.) Indeed, its biggest client is AstraZeneca. (*Id*. at 32.) AstraZeneca is approximately one quarter of Vynamic's business. (*Id*. at 58.) Vynamic's second largest client is Pfizer, a pharmaceutical company. (*Id*. at 60.) Vynamic's third largest client is Shire Pharmaceuticals. (*Id*.) Vynamic's LinkedIn page highlights its focus on the healthcare industry. (*Id*. at 65-66.) Vynamic's webpage refers to the company as healthcare industry management consultants and notes that Vynamic is "[a]ll healthcare all the time." (*Id*. at 67.)

Despite the healthcare focus, Vynamic also has clients in retail, technology, and financial services. (*Id*. at 31.) Vynamic helped Five Below, a retail company, with its five-year strategic plan in 2017. (*Id*. at 36.) It also performed similar work for Johnson and Johnson in 2018. (*Id*. at 37.) For Walmart, Vynamic provided mostly strategic and related services that would help the company compete with other large retailers. (*Id*. at 135.) Vynamic has also targeted numerous companies outside the healthcare sector as possible clients, including Comcast, Aetna, Five Below,

Estee Lauder, and Walmart, as well as companies in the financial industry. (*Id*. at 39-43.) According to Dill, the healthcare and retail industries worlds are "absolutely colliding." (*Id*. at 45-46.) To bolster his conclusion, Dill pointed to the CVS-Aetna merger, as well as JPMorgan, Amazon, and Berkshire Hathaway creating a healthcare conglomerate. (*Id*.)

Vynamic works with startups as well as with large companies. (*Id*. at 49.) Dill testified that that the sophistication level of Vynamic's clients varies greatly. (*Id*. at 50.) Vynamic works with two-person companies, growing companies with hundreds of employees, and multibillion-dollar companies. (*Id*.)

Vynamic's competitors include consulting and technology companies, such as Accenture, Deloitte, Ernst & Young, North Highland, PricewaterhouseCoopers, and McKinsey. (*Id*. at 63.) Dill was also questioned about whether he viewed Diebold as a competitor of Vynamic. Dill stated that he did because Diebold looked to engage new customers in new ways, ways that might be developed by Vynamic. (*Id*. at 55.) Specifically, Dill noted that Diebold sought "new ways to engage customers, new solutions that need to be created. [Vynamic is] working with our customers on those same exact solutions." (*Id*. at 55.) Dill also expressed concern about the expansion of both companies in the United States. As each expand, he "worr[ies] [that] . . . the interactions will get more and more tricky." (*Id*.) However, during his deposition in July 2018, Dill testified that he did not consider Vynamic and Diebold to be competitors. (*Id*. at 62.) But, "with the merging of the industries and the emergence of Amazon, the emergence of CVS Aetna, I view [Diebold] as a competitor at [the time of trial]." (*Id*.)

At the time of the trial, Vynamic had not experienced any actual consumer confusion with Diebold regarding the marks at issue here. (*Id*. at 73.) Vynamic has also not seen any lost sales because of Diebold's Vynamic software. (*Id*.; *see also id*. at 141.) Dill testified that although he

was unaware of any customer confusion, the Vynamic team reported internal confusion. (*Id*. at 73) Calista echoed that there was internal confusion at Vynamic, but he also could not point to any confusion in the marketplace. (*Id*. at 140-41.)

### b. Diebold

Diebold is an Ohio-based company with approximately 23,000 employees worldwide and sales totaling more that $4.6 billion for fiscal year 2017. (Pl.'s Updated Proposed Findings of Fact and Conclusions of Law ¶¶ 24-25, 27.) Diebold is a "services-led and software-enabled company, supported by innovative hardware." (*Id*. ¶ 28.) Diebold began in 1859 as a company that manufactured safes. (Feb. 5, 2019 Trial Tr. at 14.) The company transitioned into the ATM space in the '80s and '90s. (*Id*.) In 2016, Diebold acquired a competitor, Wincor Nixdorf, and changed the name to Diebold Nixdorf. (*Id*. at 14-15.) Diebold's business has three main categories: (1) the company fixes, repairs, and maintains the equipment that it sells; (2) the company makes and sells hardware; and (3) the company makes and sells software. (*Id*. at 13-14.)

Devon Watson, Diebold's chief marketing officer, described Diebold as "a financial technology company. [It] manufacture[s] and sell[s] ATMs for banks and credit unions. [It] manufacture[s] and sell[s] point-of-sale, checkout machines, for large retailers." (*Id*. at 10.) Diebold aims "to automate, digitize, and transform the way people bank and shop." (*Id*. at 16.) Because customers of Diebold see the machines as extensions of their brands, the name of the software that allows the machine to operate does not appear on the machine. (*Id*. at 11.) ATMs vary in cost; certain models can be $5,000 to $10,000, more sophisticated models can cost $30,000 to $50,000. (*Id*. at 11-12.) A point of sale machine can cost several tens of thousands of dollars. (*Id*. at 12.) Diebold sells its ATMs to bank, credit unions, and money service businesses that have an ATM on-premises. (*Id*. at 16.) Diebold sells its point-of-sale products primarily to large

retailers, which are businesses with "many hundreds, if not thousands of locations, very often operating across multiple states or multiple countries." (*Id*. at 16-17.)

Watson described the ATM market as "niche," and testified that Diebold had few competitors within that market. (*Id*. at 17.) Specifically, Diebold competes with NCR, Hyosung, Glory, and GRG in both the ATM hardware and software markets. (*Id*. at 17-18.) The niche nature of the market, coupled with the high barriers to entry and the intellectual property necessary to serve the market makes it difficult for new entrants to enter the market. (*Id*. at 18.) In the point-of-sale market, Diebold competes with NCR, Toshiba, IBM, and Oracle. (*Id*. at 19.) Diebold does not sell software to the healthcare industry or have any business with pharmaceutical companies, and does not consider Vynamic to be a competitor. (*Id*. at 19.)

Diebold uses a group of sales representatives with defined accounts to sells its products. (*Id*. at 29.) Watson testified that Diebold's customers are extremely sophisticated. (*Id*. at 38-39.) To acquire new customers, Diebold responds to requests for proposals. (*Id*. at 29-30.) Diebold will put together a lengthy response to the request, and then a series of meetings over a period of months will take place, followed by product testing and a competitive bidding process before the customer decides. (*Id*. at 29-31.) Diebold also attends and puts on demonstrations at approximately 80-100 trade shows per year to display its products and to reach potential customers. (*Id*. at 32-33.) Diebold spends approximately four to five million dollars per year participating in these trade shows across the globe. (*Id*. at 33-34.) These trade shows are attended by payment professionals, those individuals responsible for making the decisions about ATMs and checkout options. (*Id*. at 34.) Diebold also advertises in trade publications, does digital marketing, and uses targeted ads on social media sites like LinkedIn and Twitter. (*Id*. at 36-37.)

### c.  The Marks and Vynamic's Selection of Its Marks

An example of Plaintiff's mark is on the left; an example of Defendant's mark is on the right.



Calista described how he arrived at the name VYNAMIC:

> When I came to the time to form this new company, I was really inspired and thinking about what I really wanted to accomplish and thinking about what I really was interested in and that was around sustainability, creating a healthy values-oriented business. And thinking about names and what I wanted to call the business, I'd like to call it the world's shortest business plan because it came from this idea of purity around a series of what became letters of V words vigor and vision and value. Those collection of values and the collection of V words were like that. And leading with the Vs is Vynamic, leading with our values. In doing so, in a changing environment and doing change for our clients, leading change, projects.

(Feb. 4, 2019 Trial Tr. at 79-80.)

Vynamic applied for and obtained federal registrations for the trademarks VYNAMIC®, VYNAMIC & Design®, and I AM VYNAMIC®. Vynamic registered the "VYNAMIC" mark on February 21, 2006, for:

> [m]anagement services, consulting, planning, project management, and information related thereto; business marketing advice; commercial and business consulting and information thereto; business consulting regarding new ventures and mergers and acquisitions; business analysis; market analysis; business evaluations; economic research and analysis; drafting business expert reports; administrative management of projects in the field of developing, specifying, installing and implementing business solutions; business consulting in the area of trade in technological products; providing information related to consulting in the area of enterprise organization; business consultation and private consultation in the field of executive coaching; the aforementioned services rendered through a nationwide network of resources[.]

(Pl.'s Tr. Ex 3.) Vynamic registered the "VYNAMIC & Design" and "I AM VYNAMIC" marks on February 26, 2013, for: "[b]usiness management consulting; [p]roviding information in the fields of business management, business marketing, and business mergers and acquisitions consulting, the foregoing information pertaining to the healthcare industry." (Pl.'s Tr. Exs. 5-6.) Vynamic has continually used its marks since the company's formation in 2004. (Feb. 4, 2019 Trial Tr. at 80.) Vynamic advertises through media stories, radio, podcasts, and event sponsorships. (*Id*. at 88, 91, 94-96.) Vynamic has advertised on buses in Philadelphia, as well as at the Philadelphia International Airport. (*Id*. at 96.)

### d.   Diebold's Selection of the Name "Vynamic"

Diebold hired an outside consultant, Brand Acumen, to help select a name for the product line it was developing. (Feb. 5, 2019 Trial Tr. at 40, 67.) Diebold liked that Brand Acumen worked with high profile clients, including Microsoft, HP, and Cadillac. (*Id*. at 40, 68-69.) Brand Acumen guaranteed to Diebold that it would "deliver a legally viable, aesthetic[ally] aligned and linguistically sound brand name" that would be "legally screened prior to presenting the creative name list iteration" to ensure that Diebold would not become enamored with a name that it could not legally use. (Jt. Ex. 17 [Brand Acumen Proposal].) Brand Acumen used Diebold personnel and industry participants to perform market research and to generate an initial list of names. (Feb. 5, 2019 Trial Tr. at 42; Jt. Ex. 10 [Brand Acumen Global Market Research Results].) Brand Acumen came up with eleven possible names and conducted a survey from the banking sector to provide feedback on the names. (Feb. 5, 2019 Trial Tr. at 70-71.) Brand Acumen ultimately came up with a list of four names, which Diebold narrowed down to two names, one of which was Vynamic. (*Id*. at 71-72.) On August 22, 2017, the names were provided to Diebold's CEO, along with a recommendation to select the name "Vynamic." (*Id*. at 72.) Diebold first became aware of

Vynamic when it presented the two frontrunner names to Diebold's CEO. (*Id*. at 42.) The CEO googled the names and learned that both names had dotcom addresses in use. (*Id*. at 42, 73.) The CEO expressed "a major concern with the name being used by another company." (Pl.'s Ex. 30.) When Watson, Diebold's chief marketing officer, looked at vynamic.com, however, he determined that Vynamic was a "very, very different business." (Feb. 5, 2019 Trial Tr. at 42-43.) Watson was not particularly concerned about not being able to use vynamic.com. He wrote, "I don't need a dotcom. I have one. It's dieboldnixdorf.com." (*Id*. at 44.) Because the CEO expressed concern, however, the issue surrounding the "VYNAMIC" name was discussed with Brand Acumen before it was discussed with in-house counsel. (*Id*. at 76.) A Diebold employee in product marketing asked Brand Acumen for the "pros/cons of using a name that is already in use (even if in another industry)? Some of [the CEO's] concerns were that it will limit us in social media due to twitter handles and urls already being owned?" (Pl.'s Ex. 28.) The Brand Acumen consultant reported that he was aware that the name "VYNAMIC" was in use. (Pl.'s Ex. 29.) He stated that the use of the "VYNAMIC" name was not a problem, however, because "[Diebold's] audience had no relevant association to use of either of these names in another capacity (via a Google search), and therefore they are differentiated sufficiently with [Diebold's] primary constituency." (*Id*.) Brand Acumen also reported that the "key is to dominate the first page of Google. This will not be an issue as both Vynamic and Excend are not associated with a dominant SEO profile. [Diebold] will easily usurp either on a Google search with a bit of SEO [search engine optimization] optimization effort." (*Id*.)

Ultimately, Diebold made the business decision to select use the name "VYNAMIC" for its software suite (Feb. 5, 2019 Trial Tr. at 45, 63-65; *see also id*. at 82.) In September 2017, Diebold's CEO approved the name "VYNAMIC" and then in-house counsel reviewed the name.

(*Id*. at 75, 83.) According to Watson, "this is a big world and we do completely different things. We do not do management consulting. We do not do healthcare. And use in the financial technology ATM and point of sale software space seemed very, very different." (*Id*. at 80.)

## II.   CONCLUSIONS OF LAW

To establish a trademark infringement claim, a plaintiff must demonstrate that it owns a valid and legally protectable mark, and that the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994). Claims for federal trademark infringement and federal unfair competition are evaluated using the same standard. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Additionally, the standard for evaluating a claim for unfair competition under Pennsylvania law is "essentially the same as the test for unfair competition under the Lanham Act." *Bath Auth., LLC v. Anzzi LLC*, Civ. A. No. 18-834, 2018 WL 5112889, at *4 (E.D. Pa. Oct. 19, 2018).

### A.   Validity and Ownership

Vynamic owns the registered mark "VYNAMIC" for:

[m]anagement services, consulting, planning, project management, and information related thereto; business marketing advice; commercial and business consulting and information thereto; business consulting regarding new ventures and mergers and acquisitions; business analysis; market analysis; business evaluations; economic research and analysis; drafting business expert reports; administrative management of projects in the field of developing, specifying, installing and implementing business solutions; business consulting in the area of trade in technological products; providing information related to consulting in the area of enterprise organization; business consultation and private consultation in the field of executive coaching; the aforementioned services rendered through a nationwide network of resources[.]

(Pl.'s Updated Proposed Findings of Fact & Conclusions of Law ¶ 11.) Vynamic also owns the "VYNAMIC & Design" and "I AM VYNAMIC" registered marks for: "[b]usiness management

9

consulting; [p]roviding information in the fields of business management, business marketing, and business mergers and acquisitions consulting, the foregoing information pertaining to the healthcare industry." (*Id.* ¶¶ 13, 15.) Vynamic has a federal trademark registration for its marks. Such registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, [and] of the registrant's ownership of the mark." 15 U.S.C. § 1115(a). If the registration becomes incontestable, as it has here, it "shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, [and] of the registrant's ownership of the mark." § 1115(b). The Court concludes that Vynamic has satisfied the validity and ownership prongs of its trademark infringement claim.

### B. *Lapp* Factors

Courts in the Third Circuit use the factors set forth in *Interspace Corp. v. Lapp Inc.*, 721 F.2d 460 (3d Cir. 1983), when addressing the likelihood of confusion prong of a claim for trademark infringement. This is a case of reverse confusion, in which the junior user of the mark, here, Diebold, is the larger and more powerful company relative to Vynamic, the smaller company and senior user of the mark. In a case of reverse confusion, the *Lapp* factors are: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertising through the same media; (8) the extent to which the targets of the parties' sales efforts are the

same; (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; (10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market. *A & H Sportswear*, 237 F.3d at 234. No single factor is dispositive, and in some cases, some factors may not be relevant to the likelihood of confusion analysis. *Id.*

In a reverse confusion case, the consuming public may assume the that the junior, but more powerful, mark user is the source of the senior user's products. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 301 (3d Cir. 2001) The harm to the senior user is not just that its goodwill is appropriated, but that the value of its mark is diminished. *Id.* at 301-02. The fundamental issue in a trademark infringement lawsuit is whether the consuming public is likely to be confused about the source of the product. *Id.*

### 1. Degree of Similarity

The degree of similarity between two marks is often the single most important factor in determining whether a likelihood of confusion exists. *See, e.g.*, *Fisons Horticulture*, 30 F.3d at 476; *Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 462 (E.D. Pa. 2012). This is particularly true if the products directly compete. *Checkpoint Sys., Inc.*, 269 F.3d at 281. The marks do not have to be identical, merely confusingly similar. *See Fisons Horticulture*, 30 F.3d at 477.

Courts should compare the appearance, sound, and meaning of the marks to determine similarity. *Checkpoint Sys., Inc.*, 269 F.3d at 281. However, "[s]ide-by-side comparison of the two marks is not the proper method for analysis when the products are not usually sold in such a fashion. Instead, an effort must be made to move into the mind of the roving consumer." *A & H*

11

*Sportswear*, 237 F.3d at 216. It is the "more forceful and distinctive aspects of a mark" that should be the court's focus. *Id.*

This factor favors Vynamic. The marks are pronounced identically and have a similar appearance, notwithstanding the different color schemes applied.

Diebold concedes that the marks here are similar, including that the marks are spelled the same and sound the same. (Def.'s Resp. to Pl.'s Updated Proposed Findings of Fact and Conclusions of Law ¶¶ 22-23.) The Court was not subtle when it addressed this factor at summary judgment. The Court was concerned that the look and feel of these marks was confusingly similar and that concern was confirmed during trial. The use of a different color or an added word here and there does not make these marks less similar when focusing on the distinctive part of the mark: the word "VYNAMIC."

When addressing this factor, Diebold continues to maintain that the "use of a house mark can serve to diminish the likelihood of confusion." (Def.'s Supplemented Proposed Findings of Fact and Conclusions of Law at 36.) The Court addressed this argument previously. Some courts continue to adhere to the belief that the use of a housemark diminishes the likelihood of confusion, even in reverse confusion cases. *See Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, Civ. A. No. 11-3684, 2017 WL 3719468, at *22 (D.N.J. Aug. 29, 2017) (citing cases). However, in a reverse confusion case, the use of a well-known housemark may exacerbate confusion by reinforcing a link between the mark and the junior user. *A & H Sportswear*, 237 F.3d at 230; *Cue, Inc., v. Gen. Motors LLC*, Civ. A. No. 13-12647, 2016 WL 4074134, at *5 (D. Mass. July 29, 2016) ("In a case of reverse confusion, however, a junior user's consistent use of a housemark will *aggravate*, rather than mitigate reverse confusion by reinforcing the association of the similar mark with the alleged infringer.").

The law is cloudy on whether a housemark can decrease the likelihood of confusion in a reverse confusion case. Moreover, the record does not establish that Diebold always used its housemark: Diebold's chief marketing officer testified that there were times when Diebold used the "VYNAMIC" mark without the Diebold housemark both at trade shows and in social media. (Feb. 5, 2019 Trial Tr. at 51.) For those times when it stood alone, the likelihood of confusion would have necessarily increased.

Diebold cannot escape infringement liability by taking Vynamic's name and just adding Diebold to it. However, although this important factor clearly favors Vynamic, it is only one piece of a more complicated puzzle and is insufficient by itself in this case to find that Diebold has infringed on Vynamic's mark.

### 2. Strength of the Mark

#### a. Conceptual strength

The strength of a mark is determined by its (1) conceptual strength and (2) commercial strength. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 184-85 (3d Cir. 2010). The conceptual strength of a mark refers to the inherent features of the mark. *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 472 (3d Cir. 2005). Courts use four categories to classify the conceptual strength of a mark, from strongest to weakest: "(1) arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods; (2) suggestive terms, which suggest rather than describe the characteristics of the goods; (3) descriptive terms, which describe a characteristic or ingredient of the article to which it refers; and (4) generic terms, which function as the common descriptive name of a product class." *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008). Within the first category, fanciful terms are "'coined' words that have been invented or selected for the sole

purpose of functioning as a trademark" or service mark. 2 McCarthy on Trademarks § 11:5. They contain "words that are either totally unknown in the language or are completely out of common usage at the time, as with obsolete or scientific terms." *Rann Pharmacy, Inc. v. Shree Navdurga LLC*, Civ. A. No. 16-4908, 2016 WL 6876350, at *4 (E.D. Pa. Nov. 22, 2016). Arbitrary or fanciful marks receive the strongest protection. *UHS of Del., Inc. v. United Health Servs., Inc.*, 227 F. Supp. 3d 381, 393 (M.D. Pa. Dec. 29, 2016) ("The strongest marks—designated arbitrary or fanciful—generally do not describe or imply anything about their associated product.").

Vynamic argues that its mark is arbitrary—and thus entitled to greater protection—because it "is a made-up word, coined by Vynamic's founder, that does not suggest anything about the services Vynamic provides." (Pl.'s Updated Proposed Findings of Fact and Conclusions of Law ¶ 35.) Diebold counters that although "VYNAMIC" is a made-up word, it is "clearly a play on the word 'dynamic.'" (Def.'s Resp. to Pl.'s Updated Proposed Findings of Fact and Conclusions of Law ¶ 35.) Additionally, Plaintiff's founder, Dan Calista, did not coin the term; it had been used by other businesses prior to the year Calista founded his company. (*Id.*)

There is no evidence that Calista was aware of any prior use of the term "Vynamic" when he came up with the name of his company. The fact that Diebold has been able to uncover a few stray uses of this term unrelated to Plaintiff's current use of the term does not diminish its strength. Moreover, though the word "Vynamic" may evoke the word "dynamic," "Vynamic" has no meaning in the English language. The word "Vynamic" is made up and enjoys substantial conceptual strength.

### b. Commercial strength

The commercial strength of a mark examines its marketplace recognition. *Freedom Card, Inc.*, 432 F.3d at 472. In a reverse confusion case, it should be analyzed in terms of the commercial

strength of the junior user as compared to the senior user, and any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark. *A & H Sportswear*, 237 F.3d at 231. The focus "in resolving reverse confusion should be the commercial impact of the stronger junior user's mark on the weaker mark of the senior but less dominant user." *Freedom Card, Inc.*, 432 F.3d at 473. That is, has the junior user been able to overwhelm the marketplace, thereby diminishing the value of the senior user's mark? *Checkpoint*, 269 F.3d at 303.

Plaintiff has failed to demonstrate commercial strength because the record lacks evidence that Diebold has overwhelmed the marketplace. As will be discussed later, the lack of overlap regarding the parties' customers and markets makes it unlikely that Diebold's use of the "VYNAMIC" mark will overwhelm the marketplace. There is simply no evidence in the record that the value of Vynamic's mark has been diminished because of Diebold's use of the term. The Court would thus be left to speculate that Diebold could saturate the market and diminish the value of Vynamic's mark in the future should the two companies find themselves in similar markets. But there is no support for such speculation.

Given the strong conceptual strength of the mark coupled with the weaker commercial strength, the Court considers this factor neutral.

### 3. Customer Sophistication

"When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. *Checkpoint Sys.*, 269 F.3d at 284. When addressing this factor, courts consider the price of the goods and the level of care that the customer takes when making the purchase. *See R.J. Ants, Inc. v. Marinelli Enters.*, 771 F. Supp. 2d 475, 495-96 (E.D. Pa. 2011). "[I]f goods are expensive, or

there is evidence that the average buyer exercises a certain level of care in making the purchase, or is a professional or commercial consumer, confusion is deemed less likely." *Id.*

No customer is buying an ATM or a point-of-sale machine on a whim. These are complicated and expensive pieces of equipment sold to specific customers. There are few players in the market with Diebold, a fact that greatly lessens the likelihood of confusion. Similarly, Vynamic's services are largely targeted at a specific market segment. Vynamic's customers are also mostly sophisticated, know the services that they are seeking from Vynamic, and are unlikely to be confused in securing those services.

Diebold hired Christopher Stomberg to opine on the market overlap between the two companies as well as the sophistication of the customers. (Def.'s Ex. 64 [Expert Report of Christopher Stomberg].) He expressed that that there was no overlap between the parties' products and services. (Feb. 5, 2019 Trial Tr. at 97.) He further stated that the parties' respective customers were sophisticated. (*Id.*) "The customers of these two companies are large and sophisticated businesses, and the products and services their customers buy from them are complex and cost anywhere from tens of thousands to millions of dollars." (Expert Report of Christopher Stomberg at 4.)

Vynamic points out that its clients vary in size and sophistication. Regardless of how the Court defines the exact contours of the customers here, the evidence points to goods and services that are costly and customers that take considerable time before making purchases.

The record in this case makes clear that the customers of both parties are sophisticated. The products and services offered by both companies are complicated and expensive. Moreover, both parties must tailor products to meet specific customer needs. Both companies cultivate

relationships over years. The customers here are sophisticated and hence unlikely to be confused about the source of the goods.

### 4.   Length of Time Mark Has Been Used and Lack of Confusion

If the parties concurrently use similar marks for a sufficient period without actual confusion, it may be inferred that future consumers will also not be confused. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 717 (3d Cir. 2004). This factor is weighed alongside evidence of actual confusion. *The Steak Umm Co. v. Steak 'Em Up, Inc.*, Civ. A. No. 09-2857, 2011 WL 3679155, at *5 (E.D. Pa. Aug. 23, 2011). "Evidence of actual confusion is not required to prove likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 291. However, the longer a product has been sold without actual confusion, the stronger the inference that confusion will not occur in the future. *See Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 205 (3d Cir. 1995).

The Third Circuit also recognizes the concept of initial interest confusion. *See Checkpoint Sys.*, 269 F.3d at 292. Initial interest confusion occurs when a customer is drawn to a product by its similarity to a known mark, but the customer learns of the true identity and origin of the product before a sale occurs. *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 290 (D.N.J. 2006).

"Product relatedness and level of care exercised by consumers are relevant factors in determining initial interest confusion. When products are similar, a firm is more likely to benefit from the goodwill of a firm with an established mark. And when consumers do not exercise a high level of care in making their decisions, it is more likely that their initial confusion will result in a benefit to the alleged infringer from the use of the goodwill of the other firm. Conversely, in the absence of these factors, some initial confusion will not likely facilitate free riding on the goodwill of another mark, or otherwise harm the user claiming infringement." *Checkpoint Sys., Inc.*, 269 F.3d at 296-97.

Diebold's chief marketing officer reported that Diebold has experienced no customer confusion since rebranding. (Feb. 5, 2019 Trial Tr. at 89.) Courts have concluded that a similar timeframe to that here is long enough to uncover evidence of actual confusion. *See Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 768 (8th Cir. 2010) ("The district court held Sensient failed to produce any evidence of actual confusion, which it noted was telling since the SensoryEffects name has been in use at the time for approximately one year."); *Giorgio Beverly Hills, Inc. v. Revlon Consumer Prods. Corp.*, 869 F. Supp. 176, 185-86 (S.D.N.Y. 1994) ("Revlon has promoted and sold Charlie RED for over one year, though. As with the domestic market, Giorgio has failed to present any evidence of actual confusion in the European markets."). *But see Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 121 (1st Cir. 2006) ("Historically, we have attached substantial weight to a trademark holder's failure to prove actual confusion only in instances in which the relevant products have coexisted on the market for a long period of time. This is not such a case: M.V.'s product was introduced to the Puerto Rican market in April of 2003, and M.V.'s own evidence suggests that sales did not proliferate until the summer of 2004. This corresponds to the time frame in which Borinquen discovered the presence of Nestlé Ricas and acted to protect its mark. Since the preliminary injunction issued just over a year later, there was no protracted period of product coexistence.")

At the time of the Court's summary judgment opinion, the Court determined that one year was long enough that one would expect some evidence of actual confusion. No evidence of actual confusion has been reported in the intervening months. Although the parties have a dispute over the exact amount of time Diebold's Vynamic products have existed in the marketplace with Vynamic, it is now well over one year. Thus, these factors weigh in favor of Diebold.

### 5.   Intent of Defendant in Adopting the Mark

This factor requires courts to consider whether the defendant selected the mark to intentionally confuse consumers and whether the defendant used adequate care in investigating its mark prior to adoption. *Sabinsa Corp.*, 609 F.3d at 187. An intent to confuse is not required to make out a Lanham Act violation, but willful adoption of a similar mark weighs strongly in favor of finding a likelihood of confusion. *Checkpoint Sys.*, 269 F.3d at 286. A mere intent to copy is insufficient; rather, "defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." *Sabinsa Corp.*, 609 F.3d at 187.

Lack of care in adopting a similar mark is not enough to tilt this factor towards a finding of a likelihood of confusion. *See Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 469-70 (E.D. Pa. Jan. 25, 2012) ("However, the Third Circuit Court of Appeals has not adopted a 'carelessness' standard for [reverse confusion cases]. To the contrary, the Court of Appeals considered and declined to adopt such a test."); *see also Parks v. Tyson Foods, Inc.*, Civ. A. No. 15-946, 2015 WL 9316060, at *9 (E.D. Pa. Dec. 23, 2015).

In the reverse confusion context, an intent to confuse is unlikely to be present. *A & H Sportswear*, 237 F.3d at 232. "If such an intent to confuse does, in fact, exist in a reverse confusion case, it should weigh against the defendant in the same manner as it would in a direct confusion case." *Id*. The Third Circuit has specifically noted its reluctance to adopt a "mere carelessness" standard when addressing this *Lapp* factor: "Ultimately, all of the *Lapp* factors are meant only to determine whether *confusion* is likely; mere carelessness, like deliberate copying, does not shed any light on this inquiry." *Id*. at 233.

Rather, a plaintiff must demonstrate an intent to confuse or present evidence of predatory intent on the part of the defendant. *See Kinbook*, 866 F. Supp. 2d at 470. "[I]ntent to confuse is relevant to both reverse confusion and direct confusion. The difference is that the tenor of the intent to confuse evidence changes from the deliberate intent to palm off or exploit the goodwill of the senior user's mark (deliberate confusion) to the deliberate intent to push the senior user out of the market (reverse confusion)." *Freedom Card*, 432 F.3d at 479.

The Court concludes that the record lacks evidence that Diebold intended to confuse customers about the source of goods or services here. Instead, it simply did not care if there was another VYNAMIC out in the world. From the Court's perspective, Diebold did not play nicely in the corporate sandbox. It learned that a smaller child had a shiny name that it wanted. So, Diebold decided that it would take it. But trademark law requires a likelihood of confusion, and Vynamic has failed to demonstrate any intent to confuse or intent to force Vynamic out of its market. Indeed, the back and forth between Diebold and Brand Acumen upon discovering that the name "Vynamic" was in use demonstrates its lack of intent. Diebold pointed out that the name "Vynamic" was being used by a consulting company in healthcare management and sought guidance regarding the use of a name/mark already used in another industry. (*See* Pl.'s Ex. 49.) The record shows that Diebold did not seek to push Vynamic out of its market. Diebold simply never envisioned sharing a market with Vynamic. Diebold had spent significant resources on arriving at a new name for its software suite and the company was content to act thoughtlessly upon finding another company in another market that was already using the name. The Court concludes this factor weights in favor of Diebold.

### 6. Marketing/Advertising Channels and Customer Targets

The likelihood of confusion increases "the greater the similarity in advertising and marketing campaigns." *Checkpoint Sys.*, 269 F.3d at 288-89. Likewise, "when parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion." *Id.* at 289.

These factors favor Diebold. As for the channels of marketing and advertising, there are large differences between the two companies. Diebold relies on trade shows and responds to requests for proposals. It also sells software and services for the products that it sells. There is no evidence that Vynamic obtains new customers through these channels. Rather, it advertises within the area, sponsors events, and earns good press to tout its services.

Similarly, the Court finds that there is little to no overlap with respect to customer targeting. The parties dispute the amount of customer overlap between them, as well as the status of the industries in which the parties operate. Vynamic sees itself as a company that exists not only in the healthcare industry, but also in the retail and financial industries. It also asserts that, even within the healthcare industry, many businesses also operate retail and financial businesses. As the retail and healthcare industries converge, Vynamic anticipates that its business will overlap with that of Diebold. For example, retailers such as Walmart sometimes perform what can be described as healthcare-related activities. And many retail pharmacies also operate within the healthcare industry. Moreover, customer overlap exists between the two companies; both Vynamic and Diebold counted the retailer Five Below as a customer. (Feb. 5, 2019 Trial Tr. at 61-62.)

It is clear to the Court, however, that the overwhelming bulk of Vynamic's clientele operates in the healthcare industry, specifically pharmaceuticals. Vynamic's website highlights its experience as a healthcare industry management consultant, and even touts that the company's focus is "exclusively on the healthcare industry" and that it's "All Healthcare All The Time."

Additionally, the fact that Five Below once did business with a company named "Vynamic" and now does business with a company who has a product with the name "Vynamic" is not problematic, particularly because these entities exist in different markets. Five Below is a customer of many businesses: it must buy inventory, provide health insurance for its employees, purchase insurance, rent space, have checkout lanes, and even stock its restrooms and breakrooms. Five Below relies on many vendors to run its business; it simply does not follow that an overlap in customers equates with a likelihood of confusion if the vendors are in different businesses. Stated simply, if two companies want to sell vastly different goods and services to one customer, trademark law should not stand in the way.

As Stomberg opined, "Vynamic, LLC offers management consulting services to the healthcare industry. [Diebold] offers hardware and software solutions to retail and financial services customers." (Expert Report of Christopher Stomberg at 4.) He concluded that there was no substantive overlap in the markets of the two companies: "Not only do these products not sit next to each other on the shelf, they appear to be in different shops, serving different customers altogether." (*Id.*)

Diebold is not a player in the healthcare industry. And even if some of its products are in a retailer or a retail pharmacy, those products would be an ATM or a check-out machine. Vynamic offers consulting services to pharmaceutical companies to help those companies operate better and better reach their customers. Vynamic does not make any products that would overlap with a product produced by Diebold, even if both companies occasionally worked with the same customers. Moreover, currently, the customer overlap is minimal, if it exists at all.

### 7.  The Relationship of the Goods in the Minds of Consumers

This factor looks at whether buyers and users of each parties' goods are likely to encounter

the goods of the other. *Checkpoint Sys.*, 269 F.3d at 286. "The test is whether the goods are similar enough that a customer would assume they were offered by the same source." *Id*.

Upon listening to the testimony and reviewing the record, the Court concludes that these parties operate in distinct and separate spheres such that customers would not assume the parties' goods were offered by the same source. The products sold by Vynamic and Diebold serve different functions and there is no overlap in the product technology. The Court does not agree with Vynamic's statement that "the parties' goods and services overlap functionally, that is, they solve the same types of business problems for the same types of customers." (Pl.'s Updated Proposed Findings of Fact and Conclusions of Law ¶ 65.) Vynamic offers consulting services, primarily to customers in the healthcare industry. Diebold does nothing of the sort, instead manufacturing and servicing ATMs and point-of-sale machines.

8. **Other Facts Suggesting that the Consuming Public Might Expect the Larger, More Powerful Company to Manufacture Both Products, or Expect the Larger Company to Manufacture a Product in the Plaintiff's Market, or Expect the Larger Company to Expand into the Plaintiff's Market**

"This factor is necessarily transformed in the reverse confusion context to an examination of other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market." *A & H Sportswear, Inc.*, 237 F.3d at 234. The Third Circuit has held that evidence of converging markets is important in cases involving non-competing products. *Checkpoint Sys.*, 269 F.3d at 290.

Vynamic spent a great deal of time trying to convince the Court that the converging nature of the healthcare and retail markets made it likely that there would soon be product overlap

between Vynamic and Diebold. The Court is not persuaded by this argument. The record lacks any evidence that Vynamic will soon find itself competing with Diebold. The testimony offered by Vynamic is too speculative to suggest that either company will soon enter the other's realm. There is nothing in the record from which the Court can conclude that there are other facts suggesting that consumers might expect Diebold to be responsible for Vynamic's consulting services or that Diebold is likely to expand onto Vynamic's turf.

### 9.  Weighing the *Lapp* factors

The Court concludes that Vynamic has failed to demonstrate a likelihood of confusion. Undoubtedly, the marks here are very similar. This factor weighs in Vynamic's favor. But this is the only *Lapp* factor that markedly tilts towards Plaintiff. Plaintiff's mark is conceptually strong, but the lack of commercial strength renders this factor neutral. Ultimately, the evidence demonstrates that the two companies using the mark do not compete against each other; rather, they market and sell their goods and services to different customers. Moreover, the lack of confusion in the marketplace weighs heavily in favor of Diebold. Finally, Diebold did not intend to confuse consumers. The evidence demonstrates that Diebold believed it did not overlap with Vynamic, a reasonable belief given the evidence presented at trial. Having spent significant resources on coming up with a new name for its software suite, Diebold was unconcerned that a smaller player in an unrelated field already was using the name. The Court cannot, however, find that it acted with an intent to confuse as interpreted by the Third Circuit.

## III.    CONCLUSION

The Court concludes that Plaintiff has failed to demonstrate a likelihood of confusion. Accordingly, it cannot recover on any of its claims. Judgement is entered in favor of Diebold. An Order consistent with this Memorandum will be docketed separately.